IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DEMETRIUS J. ANDERSON,
  Petitioner,

vs.        Case No.:  1:15cv186/MMP/EMT

JULIE JONES,
  Respondent.
_____/

## **REPORT AND RECOMMENDATION**

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 21).  Petitioner retained counsel and filed a reply (ECF No. 26).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show

that Petitioner is not entitled to relief.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 21).[1]  Petitioner was charged in the Circuit

Court in and for Alachua County, Florida, Case No. 2010-CF-3679, with one count

of tampering with a witness (Count I), one count of burglary with battery (Count II),

one count of violation of pretrial release for domestic violence (Count III), and one

count of violation of a domestic violence injunction (Count IV) (Ex. A at 88–89).  A

jury trial was held on October 6, 2011 (Exs. B, C).  The court granted a judgment of

acquittal on the violation of a domestic violence injunction charge (Count IV) (Ex. C

at 202).  The jury found Petitioner not guilty of the witness tampering charge (Count

I), but guilty of burglary with battery (Count II) and violation of pretrial release for

domestic violence (Count III) (Ex. A at 92, 109–11, 119, Ex. C at 288–89).  The court

sentenced Petitioner to a split sentence of 120 months in prison, followed by one year

of probation, on the burglary with battery count, and a concurrent term of 364-days

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with
Respondent's answer (ECF No. 21).  If a cited page has more than one page number, the court cites
to the "Bates stamp" page number.

imprisonment on the violation of pretrial release count, with pre-sentence jail credit of 2 days (Ex. A at 112–18).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-5893 (Ex. A at 151–52, Ex. F). The First DCA affirmed the judgment per curiam without written opinion on July 5, 2012, with the mandate issuing September 12, 2012 (Exs. I, K). Anderson v. State, 95 So. 3d 216 (Fla. 1st DCA 2012) (Table). Petitioner sought certiorari review in the Supreme Court of the United States (Ex. L). The Supreme Court denied review on February 19, 2013 (Ex. N).

On August 16, 2013, Petitioner filed a counseled motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. O at 1–12). The court held an evidentiary hearing on June 11, 2014 (Ex. P). The circuit court denied the Rule 3.850 motion on June 13, 2014 (Ex. O at 61–67). Petitioner appealed the decision to the First DCA, Case No. 1D14-3129 (Ex. Q). The First DCA affirmed the decision per curiam without written opinion on May 5, 2015, with the mandate issuing May 21, 2015 (Ex. T). Anderson v. State, 162 So. 3d 986 (Fla. 1st DCA 2015) (Table).

Petitioner filed the instant federal habeas action on August 14, 2015 (ECF No. 1).

## II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  "Clearly established Federal law, includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions." Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation omitted).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct.

362, 154 L. Ed. 2d 263 (2002) (quoting <u>Williams</u>, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  However, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See* <u>Woods</u>, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  <u>Williams</u>, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light

of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Richter).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court

may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C.

§ 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless

the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

## III.    PETITIONER'S CLAIMS

A.    <u>Ground One</u>:  "The evidence was legally insufficient to convict Anderson of burglary with battery and is a violation of Anderson's due process rights and rights to a fair trial."

Petitioner contends that under Florida law, one of the elements of burglary is that the accused unlawfully entered a structure with the intent to commit a crime (ECF No. 1 at 5; ECF No. 2 at 12–17; ECF No. 26 at 2–6).[3]  Petitioner argues that the evidence adduced at his trial suggested that he developed intent to forcefully open a locked bedroom door (which constituted criminal mischief) and/or assault or batter Anthony Green <u>after</u> he entered Leyna Bell's dwelling, but this evidence was insufficient to prove that he intended to commit any of those crimes <u>at the time he entered</u> the dwelling (*id.*).  Therefore, the evidence was insufficient to satisfy the intent element of Florida's burglary statute (*id.*).  Petitioner asserts he exhausted this claim by presenting it on direct appeal (ECF No. 1 at 6).

---

[3] The court's references to page numbers of the parties' filings reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

Respondent concedes Petitioner exhausted his state court remedies as to this claim (ECF No. 21 at 17).  Respondent contends the state court properly denied the claim (*id.* at 18–32).

   1. Clearly Established Federal Law

As an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict; that is, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.  <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  When reviewing a claim of insufficient evidence in federal habeas corpus, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (citation omitted); *see also* <u>Conklin v. Schofield</u>, 366 F.3d 1191, 1200 (11th Cir. 2004).  The evidence need not rule out every theory except that which signifies guilt beyond a reasonable doubt; "[t]he simple fact that the evidence gives some support to the defendant's theory of

innocence does not warrant the grant of habeas relief." <u>Wilcox v. Ford</u>, 813 F.2d 1140, 1143 (11th Cir. 1987). Moreover, because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. <u>Wilcox</u>, 813 F.2d at 1143. "It is only where, after viewing the evidence in its most favorable light and making all credibility decisions in favor of the state the evidence still fails to at least preponderate in favor of the state, that we become concerned with conflicting inferences." <u>Cosby v. Jones</u>, 682 F.2d 1373, 1383 (11th Cir. 1982).

Under Florida law, where a conviction was brought about solely through circumstantial evidence, the State must meet a stricter burden of proof, that the evidence presented be "inconsistent with any reasonable hypothesis of innocence." <u>State v. Law</u>, 559 So. 2d 187, 188 (Fla. 1989). "The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine." *Id.* However, this standard of proof is inapplicable for federal habeas review of a claim of insufficiency of the evidence; federal constitutional analysis under <u>Jackson</u> is all that is required. <u>Bishop v. Kelso</u>, 914 F.2d 1468, 1472–73 (11th Cir. 1990); <u>Wilcox</u>, 813 F.2d at 1145 & n.7.

2.    Federal Review of State Court Decision

Petitioner presented this claim in the direct appeal of his conviction to the First DCA (Ex. F).  The First DCA affirmed the judgment of conviction without written explanation (Ex. I).

"[T]he summary nature of a state court's decision does not lessen the deference that it is due."  Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also* Harrington, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").  Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision.  *See* Harrington, 562 U.S. at 98.  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Harrington, 562 U.S. at 102; *see also* Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state

court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The state court record shows that the Amended Information charged Petitioner as follows with respect to the burglary with battery charge:

> DEMETRIUS JEVON ANDERSON, in Alachua County, Florida, on or about September 11, 2010, did then and there unlawfully enter or remain in a structure, to-wit: a dwelling located at 613 SW 75th Street, #107, Gainesville, Alachua County, Florida, the property of LEYNA MARIE BELL, with intent to commit therein the offense of BATTTERY and/or CRIMINAL MISCHIEF and/or ASSAULT, and in the course of committing said burglary did also commit a battery upon ANTHONY GREEN, contrary to Section 810.02(2)(a), Florida Statutes.

(Ex. A at 88).

At trial, the jury heard the following testimony as relevant to the burglary charge. Leyna Bell testified that between 1:30 and 2:00 a.m. on September 11, 2010, Petitioner left a message on her voicemail stating, "Leyna, you don't want to answer the phone. I'm going to come over there and act retarded." (Ex. B at 144). Ms. Bell testified that based upon her past experience with Petitioner, ". . . for Demetrius to tell me he's going to come and act retarded, he usually comes pretty violent, taking doors down . . ." (*id.*). Ms. Bell testified that she shared the message with the other adult occupants of her townhouse, including her friend Crystal and her guest Anthony Green (*id.* at 144–45). Ms. Bell testified that she and Crystal placed chairs on top of

a table and placed the table in front of the front door of the townhouse (*id.* at 145).

Ms. Bell testified that the bedrooms were in the upstairs of the townhouse, and the

front door was downstairs (*id.*).  Ms. Bell testified that she placed the table in front of

the front door so that she and the other occupants could hear if someone came into the

townhouse (*id.*).  Ms. Bell testified that shortly thereafter, Petitioner banged loudly on

the front door (*id.*).  Ms. Bell testified that Petitioner said, "Leyna, I need to go," and

she responded, "Yes, Demetrius, you need to go." (*id.* at 146).  Ms. Bell testified that

Petitioner again banged on the front door, and she again told him to leave (*id.*).  Ms.

Bell testified that Petitioner then "busted the door off of the hinges . . . and came

through the door" (*id.*).  She testified that Petitioner opened the door with such force

that he broke the door frame, caused the doorknob to dent the wall and cave into the

door, and cracked the door (*id.*).  She testified that her landlord had to replace the door

(*id.* at 146–57).  Pictures of the front door were admitted into evidence as State's

Exhibits 1-A through 1-X (Ex. D).  Ms. Bell testified that Petitioner came upstairs and

tried to enter the bathroom into which she and Crystal had run to call the police (*id.*

at 148).  Ms. Bell testified that her guest, Anthony Green, grabbed the back of

Petitioner's shirt and yanked him backwards, but Petitioner grabbed the bathroom

door frame with his hands and was trying to pull his way into the bathroom to get to

her (Bell) (*id.* at 148–49).  Ms. Bell testified that Mr. Green was able to yank Petitioner back into the bedroom (*id.*).  She testified that Petitioner said, "You want to fuck with me?  I'm fixing [sic] to fuck both of you up." (*id.* at 149).

Crystal Howard testified that she was living with Ms. Bell in September of 2010 (Ex. A at 101–02).  Ms. Howard testified that she heard Petitioner's voicemail message to Ms. Bell on September 11, 2010, and helped Ms. Bell stack furniture against the front door so they could hear if anyone opened the door (*id.* at 107–09).  Ms. Howard testified that she was with Ms. Bell and Mr. Green in the upstairs bedroom when she heard the furniture fall over downstairs (*id.* at 109–10).  Ms. Howard testified that she warned everyone that Petitioner was in the townhouse, and they locked themselves in the bedroom (*id.* at 110).  Ms. Howard testified that Petitioner yelled, "You don't want me here?", and he may have asked if he could come into the bedroom, but Ms. Bell told him no (*id.*).  Ms. Howard testified that Petitioner broke open the bedroom door and entered the room (*id.* at 114).  Ms. Howard testified that Petitioner tried to come into the bathroom, where she was attempting to shield Ms. Bell from Petitioner because she "wasn't sure what he was going to do" (*id.* at 112, 124).

As relevant to the burglary charge, Anthony Green testified that he was with Ms. Bell in her townhouse on September 11, 2010 (Ex. A at 56–58).  Green testified that he heard Petitioner's voicemail message to Ms. Bell (*id.* at 58).  He testified that he was in a bedroom upstairs, and everyone else was upstairs (*id.*).  Green testified that he heard a "crash" downstairs (*id.* at 59).  He testified that Crystal and Breanna (another friend of Ms. Bell) went to the top of the stairwell and yelled, "He's here, he's here, he's here." (*id.*).  Green testified that the women told Petitioner to leave, but Petitioner refused (*id.*).  Green testified that the women were looking down the stairs to see if Petitioner was coming up the stairs, and the women were telling Petitioner to leave (*id.*).  Green testified that Petitioner refused to leave, so the women came back into the bedroom and Green locked the door and told them to call the police (*id.* at 59–60).  Green testified that Petitioner came upstairs and began banging on the bedroom door and demanding that Ms. Bell let him in (*id.* at 60).  Green testified that Ms. Bell told Petitioner multiple times to leave, but Petitioner continued banging on the door until he knocked it open (*id.*).  Green testified that Petitioner knocked the locking mechanism of the bedroom door loose when he knocked the door open (*id.* at 61).  Green testified that Petitioner was angry and said to Ms. Bell, "What the hell is going on here?  Why haven't you answered my calls?" (*id.* at 61–62).  Green

testified that Ms. Bell and Crystal ran behind Green into the bathroom and hid in the

shower to call the police (*id.* at 63–64).

The trial court instructed the jury as follows with respect to the burglary charge:

To prove the crime of Burglary, the State must prove the following three elements beyond a reasonable doubt:

1.   DEMETRIUS JEVON ANDERSON entered or remained [in] a structure owned by or in the possession of LEYNA BELL,

2.   DEMETRIUS JEVON ANDERSON did not have the permission or consent of LEYNA BELL or anyone authorized to act for her to enter the structure at the time, and

3.   Either:

(A)   At the time of entering, DEMETRIUS JEVON ANDERSON had the intent to commit the offenses of battery, and/or assault, and/or criminal mischief in that structure, or

(B)   DEMETRIUS JEVON ANDERSON remained in the structure after permission to remain had been withdrawn with the intent to commit the offenses of battery, and/or assault, and/or criminal mischief inside the structure.

. . . .

The intent with which an act is done is an operation of the mind and, therefore, is not always capable of direct and positive proof. It may be established by circumstantial evidence like any other fact in a case.

Even though an unlawful entering of a structure is proved, if the evidence does not establish that it was done with the intent to commit the

offense of battery, assault, and/or criminal mischief, the defendant must
be found not guilty of burglary.

(Ex. A at 94, 96).

With respect to the offenses of battery, assault, and criminal mischief referenced

in the burglary instruction, the trial court instructed the jury as follows:

**BATTERY - F.S. 784.03**
To prove the crime of Battery, the State must prove the following
element beyond a reasonable doubt: DEMETRIUS JEVON
ANDERSON intentionally touched or struck ANTHONY GREEN
against his will.

**ASSAULT - F.S. 784.011**
To prove the crime of Assault, the State must prove the following
three elements beyond a reasonable doubt:

1. DEMETRIUS JEVON ANDERSON intentionally and
unlawfully threatened, either by word or act, to do violence to
ANTHONY GREEN.

2. At the time DEMETRIUS JEVON ANDERSON appeared
to have the ability to carry out the threat.

3. The act of DEMETRIUS JEVON ANDERSON created in
the mind of ANTHONY GREEN a well-founded fear that the
violence was about to take place.
. . . .
**CRIMINAL MISCHIEF - F.S. 806.13(1) - (2)**
To prove the crime of Criminal Mischief, the State must prove the
following three elements beyond a reasonable doubt:

1. DEMETRIUS JEVON ANDERSON injured or damaged
real or personal property.

      2.     The property injured or damaged belonged to LEYNA MARIE BELL.

      3.     The injury or damage was done willfully and maliciously.

"Willfully" means intentionally, knowingly and purposely.

"Maliciously" means wrongfully, intentionally, without legal justification or excuse, and with the knowledge that injury or damage will or may be caused to another person or the property of another person.

(Ex. A at 97–99).

Additionally, the trial court instructed the jury as follows with respect to the

"with battery" enhancement to the burglary charge:

If you find DEMETRIUS JEVON ANDERSON guilty of burglary, you must also determine if the State has proved beyond a reasonable doubt whether, in the course of committing the burglary, DEMETRIUS JEVON ANDERSON battered any person. A battery is an actual and intentional touching or striking of another person against that person's will or the intentional causing of bodily harm to another person.

An act is committed "in the course of committing" if it occurs in the attempt to commit the offense or in flight after the attempt or commission.

Therefore, if you find the defendant guilty of burglary, it will be necessary for you to state in your verdict whether in the course of the burglary the defendant battered any person.

. . . .

>   Authority to enter or remain in a structure need not be given in
>   express words.  It may be implied from the circumstances.  It is lawful
>   to enter or remain in a structure of another if, under all the
>   circumstances, a reasonable person would believe that he had the
>   permission of the owner or occupant.

(Ex. A at 96–97).

The First DCA's rejection of Petitioner's due process claim could have been based upon the theory that, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the evidence was sufficient to satisfy the essential elements of the burglary charge, including the intent element, beyond a reasonable doubt.  It is possible that fairminded jurists could disagree that this theory is inconsistent with the holding in Jackson; however, this potential for disagreement precludes this court from granting habeas relief on this claim.  *See* Harrington, 562 U.S. at 786 ("A state court's determination that a claim lacks merit precludes habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."); *id.* (§ 2254(d) preserves the federal court's authority to issue the writ in cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents); *see also* Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1127 (11th Cir. 2012) (if, at a minimum, fairminded jurists could disagree about the correctness of the state court's

decision, the state court's application of Supreme Court precedent was not unreasonable, and AEDPA precludes the grant of habeas relief) (citing Harrington, supra); Johnson v. Sec'y, Dep't of Corr., 643 F.3d 907, 910 (11th Cir. 2011) (". . . only 'if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents' may relief be granted.") (quoting Harrington, supra ).  Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

      B.   Ground Two:  "The burglary with battery conviction is legally inadequate, "Delgado error," and is in violation of Anderson's due process rights and rights to a fair trial."

Petitioner alleges the State's burglary charge was based upon alternative theories, that he illegally entered the townhouse, or he illegally remained in the townhouse (ECF No. 1 at 7; ECF No. 2 at 18–20; ECF No. 26 at 6–12).  Petitioner alleges the prosecutor argued to the jury that Petitioner could be convicted under either theory (id.).  Additionally, the trial court instructed the jury that it could convict Petitioner under either theory (id.).  Petitioner alleges the State presented evidence supporting only one theory, that he illegally entered Ms. Bell's townhouse.  He alleges the State did not present any evidence to support the "remained in" theory (id.).  Petitioner alleges the jury returned a general verdict of guilt and thus did not specify

under which theory they found him guilty.  Petitioner claims that his burglary conviction violates due process, because in  Delgado v. State, 776 So. 2d 233, 238, 241 (Fla. 2000), the Florida Supreme Court held that a conviction under a general verdict is improper when it rests on multiple bases, one of which is legally inadequate (*id.*).  Petitioner cites Yates v. United States, 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957) as the clearly established federal law governing his due process claim (ECF No. 2 at 19).  Petitioner states he presented this claim to the First DCA on direct appeal (ECF No. 1 at 7).

Respondent concedes Petitioner exhausted this claim in the state courts by presenting it on direct appeal (ECF No. 21 at 33).  Respondent contends the First DCA's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 34–38).

1.    Clearly Established Federal Law

Constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a verdict that may rest on a legally invalid theory.  *See* Yates v. United States, 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957), *overruled on other grounds by* Burks v. United States, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) (emphasis added).  However, a general verdict may be upheld where the jury

is instructed on alternative theories of guilt, even if one but not all of the particular

theories charged is <u>factually</u> <u>inadequate</u>, that is, there is insufficient evidence to

support a conviction on one, but not every, ground charged. *See* <u>Griffin v. United</u>

<u>States</u>, 502 U.S. 46, 58–59, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991) (emphasis

added). In <u>Griffin</u>, the Supreme Court thoroughly explained the difference between

the two holdings:

> . . . <u>Yates</u> involved a single-count federal indictment charging a conspiracy "(1) to advocate and teach the duty and necessity of overthrowing the Government of the United States by force and violence, and (2) to organize, as the Communist Party of the United States, a society of persons who so advocate and teach." *Id.*, at 300, 77 S. Ct. at 1067. The first of these objects (the "advocacy" charge) violated § 2(a)(1) of the Smith Act of 1940 (subsequently repealed and substantially reenacted as 18 U.S.C. § 2385), and the second of them (the "organizing" charge) violated § 2(a)(3). We found that the "organizing" object was insufficient in law, since the statutory term referred to initial formation, and the Communist Party had been "organized" in that sense at a time beyond the period of the applicable statute of limitations. 354 U.S. at 304–11, 77 S. Ct. at 1069–73. We then rejected the Government's argument that the convictions could nonetheless stand on the basis of the "advocacy" object. Our analysis made no mention of the Due Process Clause but consisted in its entirety of the following:
>
> > "In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected. <u>Stromberg v. California</u>, 283 U.S. 359, 367–68 [51 S. Ct. 532, 535, 75 L. Ed. 1117]; <u>Williams v. North Carolina</u>, 317 U.S. 287, 291–92 [63 S. Ct. 207,

209–10, 87 L. Ed. 279]; <u>Cramer v. United States</u>, 325 U.S. 1, 36, n. 45 [65 S. Ct. 918, 935, n.45, 89 L. Ed. 1441]." *Id.*, at 312, 77 S. Ct. at 1073.

None of the three authorities cited for that expansive proposition in fact establishes it. The first of them, <u>Stromberg v. California</u>, 283 U.S. 359, 51 S. Ct. 532, 75 L. Ed. 1117 (1931), is the fountainhead of decisions departing from the common law with respect to the point at issue here. That case, however—which does not explicitly invoke the Due Process Clause—does not sanction as broad a departure as the dictum in <u>Yates</u> expresses, or indeed even the somewhat narrower departure that the holding in <u>Yates</u> adopts. The defendant in <u>Stromberg</u> was charged in one count of violating a California statute prohibiting the display of a red flag in a public place for any one of three purposes: (a) as a symbol of opposition to organized government; (b) as an invitation to anarchistic action; or (c) as an aid to seditious propaganda. *Id.* at 361, 51 S. Ct. at 533. The jury was instructed that it could convict if it found the defendant guilty of violating any one purpose of the statute. *Id.* at 363–64, 51 S. Ct. at 533–34. A conviction in the form of a general verdict followed. The California appellate court upheld the conviction on the ground that, even though it doubted the constitutionality of criminalizing the first of the three purposes, the statute (and conviction) could be saved if that provision was severed from the statute. We rejected that:

> "As there were three purposes set forth in the statute, and the jury were [sic] instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. . . . It follows that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the

> necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld." *Id.* at 368, 51 S. Ct. at 535.

This language, and the holding of Stromberg, do not necessarily stand for anything more than the principle that, where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground.

The same principle explains the other two cases relied on by Yates.  In Williams v. North Carolina, 317 U.S. 287, 63 S. Ct. 207, 87 L. Ed. 279 (1942), the defendant was convicted of bigamous cohabitation after the jury had been instructed that it could disregard the defendants' Nevada divorce decrees on the ground either that North Carolina did not recognize decrees based on substituted service or that the decrees were procured by fraud.  *Id.* at 290–91, 63 S. Ct. at 209–10.  The former  of these grounds, we found, violated the Full Faith and Credit Clause.  We continued:

> "[T]he verdict of the jury for all we know may have been rendered on that [unconstitutional] ground alone, since it did not specify the basis on which it rested. . . .  No reason has been suggested why the rule of the Stromberg case is inapplicable here.  Nor has any reason been advanced why the rule of the Stromberg case is not both appropriate and necessary for the protection of rights of the accused.  To say that a general verdict of guilty should be upheld though we cannot know that it did not rest on the invalid constitutional ground on which the case was submitted to the jury, would be to countenance a procedure which would cause a serious impairment of constitutional rights." *Id.* at 292, 63 S. Ct. at 210.

The third case cited by <u>Yates</u>, <u>Cramer v. United States</u>, 325 U.S. 1, 65 S. Ct. 918, 89 L. Ed. 1441 (1945), was our first opportunity to interpret the provision of Article III, § 3, which requires, for conviction of treason against the United States, that there be "two Witnesses to the same overt Act."  The prosecution had submitted proof of three overt acts to the jury, which had returned a general verdict of guilty.  After a comprehensive analysis of the overt-act requirement, *id.* at 8–35, 65 S. Ct. at 922–35, we found that two of the acts proffered by the prosecution did not satisfy it, *id.* at 36–44, 65 S. Ct. at 935–39, and accordingly reversed the conviction.  "Since it is not possible," we said, "to identify the grounds on which Cramer was convicted, the verdict must be set aside if any of the separable acts submitted was insufficient." *Id.* at 36, n.45, 65 S. Ct. at 935, n.45.[FN1]

[FN1.]  At the outset of its discussion of the two overt acts, the <u>Cramer</u> Court said:  "At the present stage of the case we need not weigh their sufficiency as a matter of pleading. Whatever the averments might have permitted the Government to prove, we now consider their adequacy on the proof as made."  325 U.S. at 37, 65 S. Ct. at 936. Petitioner [Griffin] suggests this means that <u>Cramer</u> was a sufficiency-of-the-evidence case—a point relevant to our later analysis, *see infra*, at 473–74.  That suggestion is mistaken.  As is apparent from the Court's full discussion, "adequacy on the proof as made" meant not whether the evidence sufficed to enable an alleged fact to be found, but rather whether the facts adduced at trial sufficed in law to constitute overt acts of treason.  Thus the Court could say: "It is not relevant to our issue to appraise weight or credibility of the evidence apart from determining its constitutional sufficiency." 325 U.S. at 43, 65 S. Ct. at 939. The Court of Appeals' opinion in <u>Cramer</u> makes even clearer that legal as opposed to evidentiary sufficiency was at issue; it specifically distinguishes the case from those in which multiple overt acts sufficient in law are submitted to

the jury and the conviction is upheld as long as the evidence suffices to show one of them.  *See* United States v. Cramer, 137 F.2d 888, 893–94 (2d Cir. 1943).

. . . .

Our continued adherence to the holding of Yates is not at issue in this case.  What petitioner seeks is an extension of its holding—an expansion of its expansion of Stromberg—to a context in which we have never applied it before.  Petitioner cites no case, and we are aware of none, in which we have set aside a general verdict because one of the possible bases of conviction was neither unconstitutional as in Stromberg, nor even illegal as in Yates, but merely unsupported by sufficient evidence.   If such invalidation on evidentiary grounds were appropriate, it is hard to see how it could be limited to those alternative bases of conviction that constitute separate legal grounds; surely the underlying principle would apply equally, for example, to an indictment charging murder by shooting or drowning, where the evidence of drowning proves inadequate.  *See* Schad v. Arizona, 501 U.S. at 630–31, 111 S. Ct. at 2496–97).   But petitioner's requested extension is not merely unprecedented and extreme; it also contradicts another case, postdating Yates, that in our view must govern here.

Turner v. United States, 396 U.S. 398, 90 S. Ct. 642, 24 L. Ed. 2d 610 (1970), involved a claim that the evidence was insufficient to support a general guilty verdict under a one-count indictment charging the defendant with knowingly purchasing, possessing, dispensing, and distributing heroin not in or from the original stamped package, in violation of 26 U.S.C. § 4704(a) (1964 ed.).  We held that the conviction would have to be sustained if there was sufficient evidence of distribution alone.  We set forth as the prevailing rule:  "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged."  *Id.* at 420, 90 S. Ct. at 654.  *Cf.* United States v. Miller, 471 U.S. 130, 136, 105 S. Ct. 1811, 1815, 85 L. Ed. 2d 99 (1985).

. . . .

. . . petitioner asserts that the distinction between legal error (<u>Yates</u>) and insufficiency of proof (<u>Turner</u>) is illusory, since judgments that are not supported by the requisite minimum of proof are invalid as a matter of law—and indeed, in the criminal law field at least, are constitutionally required to be set aside.  *See* <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Insufficiency of proof, in other words, is legal error.  This represents a purely semantical dispute.   In one sense "legal error" includes inadequacy of evidence—namely, when the phrase is used as a term of art to designate those mistakes that it is the business of judges (in jury cases) and of appellate courts to identify and correct.  In this sense "legal error" occurs when a jury, properly instructed as to the law, convicts on the basis of evidence that no reasonable person could regard as sufficient.   But in another sense—a more natural and less artful sense—the term "legal error" means a mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence. The answer to petitioner's objection is simply that we are using "legal error" in the latter sense.

That surely establishes a clear line that will separate <u>Turner</u> from <u>Yates</u>, and it happens to be a line that makes good sense.  Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime.  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.  Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence, *see* <u>Duncan v. Louisiana</u>, 391 U.S. 145, 157, 88 S. Ct. 1444, 1451, 20 L. Ed. 2d 491 (1968).

502 U.S. at 52–58.

2.   Federal Review of State Court Decision

Petitioner presented this claim on direct appeal to the First DCA (Ex. F).  The First DCA affirmed the conviction without written explanation (Ex. I).

The record shows that the jury was instructed that in order to find Petitioner guilty of burglary, it must unanimously find beyond a reasonable doubt that Petitioner (1) entered or remained in a structure owned by or in the possession of Leyna Bell, (2) did not have permission or consent to enter the structure at the time, and (3) either (a) at the time of entering, had the intent to commit the offense of battery, assault, or criminal mischief in the structure, or (b) remained in the structure, after permission to remain had been withdrawn, with the intent to commit the offense of battery, assault, or criminal mischief inside the structure (Ex. C at 262–63).  The jury instructions included the disjunctive article "or" within the phrase advising the jury of the two alternative methods of committing burglary and the intent requirement associated with each method, which was a correct statement of Florida law.  Petitioner's trial counsel did not object to the jury instructions or otherwise seek omission of the "remained in" language (*see id.* at 224).  Additionally, defense counsel argued to the jury that the State's evidence, with respect to Petitioner's entering and remaining in the townhouse, showed that Petitioner's intent was not to

assault or batter anyone or commit criminal mischief, but simply to talk to Ms. Bell (*id.* at 245–59).

Petitioner failed to show that his burglary conviction was unconstitutional as in <u>Stromberg</u> or even illegal as in <u>Yates</u>. Neither of the possible burglary theories submitted to the jury (either the "entered" or "remained in" theory) was legally erroneous. Petitioner's due process argument (*i.e.*, that his conviction must be reversed because the evidence adduced at trial was insufficient to support a conviction based upon the "remained in" theory, and the jury's general verdict did not indicate whether the conviction was based upon that theory) was squarely rejected by the Supreme Court in <u>Griffin</u> and <u>Turner</u>.[4] *See* <u>United States v. Bradley</u>, 644 F.3d 1213, 1250 (11th Cir. 2011) (affirming conviction for dual-object conspiracy, the first object being a scheme to defraud by wire, and the second object being the payment of illegal kickbacks, where even though the evidence may not have been sufficient to convict as to wire fraud, it was sufficient as to kickbacks, and where the jury's verdict did not indicate which object the defendant committed); <u>United States v. Browne</u>, 505 F.3d 1229, 1257–65 (11th Cir. 2007) (applying <u>Griffin</u> in federal RICO context); <u>United</u>

---

[4] In <u>Delgado v. State</u>, 776 So. 2d 233 (Fla. 2002), the Florida state case upon which Petitioner relies, the Florida Supreme Court explicitly distinguished the case from the parallel scenario where, under <u>Griffin v. United States</u>, 502 U.S. 46 (1991), a general verdict may be upheld where a jury was instructed on alternative theories of guilt and one of those theories is <u>factually insufficient</u>, as opposed to <u>legally</u> <u>inadequate</u>. *See* <u>Delgado</u>, 776 So. 2d at 242 (emphasis added).

States v. Stone, 9 F.3d 934, 937–42 (11th Cir. 1993).  Moreover, the Eleventh Circuit

has held that Yates, the Supreme Court decision which Petitioner relies upon as the

clearly established federal law governing his due process claim, is not "clearly

established federal law" for purposes of § 2254(d)(1).  *See* Clark v. Crosby, 335 F.3d

1303, 1308–10 (11th Cir. 2003).

Petitioner failed to demonstrate that the First DCA's rejection of his due process

claim was contrary to or an unreasonable application of clearly established federal

law.  Accordingly, he is not entitled to federal habeas relief on Ground Two.

C.    Ground Three:  "Mr. Anderson was deprived of his right to the effective
assistance of counsel by his trial counsel's failure to advise him to accept the
State's sixty-six (66) month plea offer."

Petitioner alleges that prior to trial, the State extended an offer of 66 months of

imprisonment in exchange for Petitioner's guilty plea (ECF No. 1 at 8; ECF No. 2 at

21–23). Petitioner alleges he rejected the offer because his trial counsel guaranteed

him that he would be acquitted of the burglary charge if he proceeded to trial, because

some of Petitioner's personal belongings were inside Leyna Bell's townhouse at the

time Petitioner entered it (*id.*).  Petitioner further alleges trial counsel failed to advise

him of the extent of the evidence against him and the overwhelming likelihood of

conviction, and that the 66-month offer was the best outcome he could reasonably

expect to obtain (*id.*).  Petitioner alleges had it not been for counsel's erroneous advice, he would have accepted the State's plea offer (*id.*).  Petitioner states he exhausted this claim by presenting it in his Rule 3.850 motion (ECF No. 1 at 9).

Respondent concedes Petitioner exhausted this claim by presented it in his Rule 3.850 motion (ECF No. 21 at 39).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 39–57).

  1. Clearly Established Federal Law

A defendant's Sixth Amendment right to counsel extends to the plea-bargaining process.  Lafler v. Cooper, — U.S. —, 132 S. Ct. 1376, 1384, 182 L. Ed. 2d 398 (2012) (citing Missouri v. Frye, — U.S. —, 132 S. Ct. 1399, 1404, — L. Ed. 2d — (2012), and McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)).  "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."  Lafler, 132 S. Ct. at 1387. The two-part test articulated in Strickland v. Washington, 466 U.S. 668 (1984) applies to claims that counsel was ineffective during the plea process.  Lafler, 132 S. Ct. at 1384 (applying Strickland's two-part test to federal habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer); Frye, 132 S. Ct. at

1404, 1409–10 (applying Strickland's two-part test to federal habeas petitioner's claim that counsel was ineffective for failing to communicate a prosecution plea offer before it lapsed); Hill v. Lockhart, 474 U.S. 52, 48, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (applying Strickland's two-part test to defendant's challenge to his guilty plea based on ineffective assistance of counsel).

Strickland's first prong requires a defendant to show "'that counsel's representation fell below an objective standard of reasonableness.'" Hill, 474 U.S. at 57 (quoting Strickland, 466 U.S. at 688). The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances." Strickland, 466 U.S. at 691. The Supreme Court warned about second-guessing professional judgments made by counsel:

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court . . . . Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts. That a guilty plea must be intelligently made is

not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing.

McMann, 397 U.S. at 769–70.

In a plea situation, counsel must provide advice "within the range of competence demanded of attorneys in criminal cases." Hill, 474 U.S. at 56–57 (quoting McMann, 397 U.S. at 771). Under this standard, representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused. Stano v. Dugger, 921 F.2d 1125, 1150–51 (11th Cir. 1991). Absent such blatant errors, however, the court should "indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990). The Eleventh Circuit has commented that "[t]he right to competent plea bargain advice is at best a privilege that confers no certain benefit," because a defendant "may make a wise decision" without assistance of counsel or a "bad one despite superior advice from his lawyer." Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between [entering a plea] and going to trial." *Id.* This requires counsel to

"offer his informed opinion as to the best course to be followed" and impart "a general knowledge of the possible legal consequences of facing trial" to the defendant.  *Id.* Therefore, a defendant's failure to "correctly assess every relevant factor entering into his decision" does not undermine a validly entered guilty plea.  *Id.* at 1509.

Strickland's second prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In the context of pleas, "[t]he . . . 'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process."  Hill, 474 U.S. at 59.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was

unreasonable under § 2254(d) is all the more difficult."  <u>Richter</u>, 131 S. Ct. at 788.

As the <u>Richter</u> Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

### 2.   Federal Review of State Court Decision

Petitioner raised this claim as his sole ground for relief in his Rule 3.850 motion (Ex. O at 7–9).   The state circuit court held an evidentiary hearing on this claim, at which Petitioner was represented by counsel (Ex. P).   Following the evidentiary hearing, the state circuit court issued a written order adjudicating Petitioner's claim as follows:

> Upon consideration of the motion, the hearing testimony, the argument of the parties, and the record, this Court finds and concludes as follows:
>
> 1.   On October 6, 2011, Defendant was found guilty by a jury of Burglary with a Battery (count II) and Violation of Pretrial Release for Domestic Violence (count III).   *See* Amended Information; Verdict. Defendant was acquitted of Tampering with a Witness, Victim, or

Informant (count I) and Violation Of a Domestic Violence Injunction (count IV).  *See* Verdict; Order Granting Motion for Judgment of Acquittal; Adjudication of Not Guilty.  After a disposition hearing, the court sentenced Defendant to a total of 120 months imprisonment in the Department of Corrections followed by a one year term of probation. *See* Judgment and Sentence.  Defendant filed an appeal.  On September 12, 2012, the First District Court of Appeal issued its mandate on the opinion per curiam affirming the judgment and sentence.  *See* Mandate.

2.    In the instant motion, Defendant alleges that trial counsel was ineffective for misadvising him to reject the State's plea offer of 66 months imprisonment.  According to Defendant, counsel advised him to reject the State's plea offer, and proceed to trial, based on counsel's opinion that the State could not legally prove that Defendant committed the burglary offense.  Defendant moves the Court to vacate the judgment and sentence and allow him to accept the State's prior plea offer of 66 months imprisonment.

3.    In order to make out a prima facie case for ineffective assistance of counsel, Defendant must assert that trial counsel's performance did not comply with prevailing standards of professionalism which proved detrimental to the defendant.  *Strickland v. Washington*, 466 U.S. 668, 691–92 (1984).  If the movant does not point to prejudice the court need not make a ruling on the performance component, and vice versa.  *Johnson v. State*, 593 So. 2d 206, 209 (Fla. 1992). Furthermore, when alleging ineffective assistance of counsel a defendant must plead unprofessional error and prejudice with specificity.  *See Smith v. State*, 445 So. 2d 323, 325 (Fla. 1983); *see also Cunningham v. State*, 748 So. 2d 328, 330 (Fla. 4th DCA 2000) (citing *Knight v. State*, 394 So. 2d 997, 1001 (Fla. 1981)) (when claiming deficient performance, "the specific omission or overt act upon which the claim of ineffective assistance of counsel is based must be detailed in the appropriate pleading").  It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  *Strickland*, 466 U.S. at 693.  The defendant must show that there is a reasonable

probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 698.

4.      To establish prejudice regarding the loss of a favorable plea offer, "the defendant must demonstrate a reasonable probability, defined as a probability sufficient to undermine confidence in the outcome, that (1) he or she would have accepted the offer had counsel advised the defendant correctly, (2) the prosecutor would not have withdrawn the offer, (3) the court would have accepted the offer, and (4) the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Alcorn v. State*, 121 So. 3d 419, 422 (Fla. 2013).

5.      The record reflects that the defense theory of the case at trial was that Defendant was a part-time resident in the victim's home. *See* Amended Motion to Dismiss; Jury Selection Transcript at 28 (lines 5–10); Trial Transcript at 5 (lines 9–11). The record also reflects that the plea offer was still available on the day of jury selection; and, that the court was willing to accept it. *See* Jury Selection Transcript at 23 (lines 20–25) – 24 (lines 1–8), 26 (lines 8–25) – 27 (lines 1–16).

6.      During the evidentiary hearing, Defendant testified that he would have accepted the plea offer of 66 months imprisonment, and not proceeded to trial, had his counsel not misadvised him that it was a viable defense to the burglary charge that he had personal property in the female victim's home. In addition, Defendant testified that: he was relying wholly on his counsel's advice when he rejected the State's plea offer; he knew nothing about the State's case against him prior to trial; and, had he known that the State had a strong case against him, he would not have proceeded to trial.

On cross-examination, Defendant acknowledged that he has a prior burglary conviction out of Columbia County from 1999 which was the product of a plea agreement. As a result of that plea agreement, Defendant served 6 years imprisonment in the Department of Corrections.

Defendant also acknowledged that he was aware prior to trial that, based on the facts of the burglary in this case, as well as his prior behaviour [sic] on other occasions, the female victim had filed a petition for domestic violence injunction against him, which was granted. Thus, subsequent to the offense, but prior to the trial, Defendant was aware that a domestic violence injunction had been granted based on his unlawful entry into the victim's apartment on multiple occasions.

Finally, Defendant admitted during the State's re-cross on the issue of the female victim's letter to him that he had received her letter and that he had passed it on to his counsel at the time, Assistant Public Defender Rachel Morris. *See* State's Trial Exhibit 6.

7.      Former defense counsel Lerone Thurston testified at the hearing that he has been a licensed attorney in Florida since 1995; and, that he has represented defendants in over 40 felony cases at trial since that time. As it relates to this case, Mr. Thurston testified that he first met with Defendant regarding this case prior to becoming attorney of record, which was on May 23, 2011. After he came into the case, Defendant provided him with voicemail messages and e-mail correspondence which he had received from the female victim. These items suggested that she and he had an ongoing relationship subsequent to the charges in this case; and, that she considered her home to be their home.

Mr. Thurston further testified that he believed, based on the information that he had received from Defendant, the female victim, and her friends regarding his [Defendant's] open access to her apartment, that Defendant had a potentially viable defense to the burglary charge. The information that he had received suggested that the victim considered herself to be in an ongoing relationship with Defendant and considered her home to be his part-time home as well. Looking back, Mr. Thurston now realizes that this defense was somewhat myopic as it relied heavily on the female victim's dynamic relationship with Defendant, as well as Defendant's self-serving description of that relationship. However, he independently recalls advising Defendant that he could not make him

any guarantees as to what would happen if he went to trial; and, that based on the possible life sentence that he was facing, he should accept the State's plea offer.

According to Mr. Thurston, Defendant was consistent and certain in his desire to proceed to trial. In discussing Defendant's options, Defendant mentioned to Mr. Thurston that he had paid his attorney in the Columbia County case a lot of money yet only received a prison sentence. Defendant indicated that he did not want to pay a private attorney only to receive a plea to a prison term. He wanted an attorney who would advocate for him and take his case to trial. Mr. Thurston testified additionally that based on Defendant's desire to go to trial he zealously advocated for Defendant the best he could with the facts that he had.

8.      Assistant State Attorney George Wright testified at the hearing that he was the person who prosecuted Defendant on behalf of the State in this case. According to Mr. Wright, Mr. Thurston indicated to him that he was having a difficult time convincing Defendant to accept a plea offer to a prison sentence, especially given the fact that the State's plea offer remained 66 months even after Defendant had retained him as counsel. However, Mr. Thurston later approached Mr. Wright and indicated that he may be able to get Defendant to accept a plea offer of 4 years. The State did not reduce its offer.

Mr. Wright further noted that there were difficulties in the State's case. One of the ongoing issues in the State's case was the changing testimony of the female victim. It was clear to the State that her "on again off again" relationship with Defendant had led her to collude with him to undermine the burglary charge. At the forefront of this collusion was a letter that she had written, at the direction of Defendant, indicating that her home was his home too. *See* State's Trial Exhibit 6. During her deposition in April 2011, the female victim admitted that she had written the letter with Defendant; and, that the material statements contained in the letter were not true. *See* Deposition of Leyna Marie Bell at 34 (lines 17–25) – 36 (lines 1–7), 40 (lines 20–25) – 47 (lines 1 -12), 74 (lines

12–25) – 79 (line l ).  She testified in conformance with her deposition testimony at trial.  *See* Trial Transcript at 150 (lines 15–25) – 164 (lines l–4), 175 (lines 5–18), 180 (lines 24–25) – 200 (lines 1–7).

9.    This Court finds the testimony of former defense counsel to be credible and the testimony of Defendant to not be credible.  First, Mr. Thurston was clear at the hearing that Defendant did not want to accept a plea to a prison sentence.  And, Mr. Thurston's explanation for why Defendant did not want to do this is credible:  Defendant did not want to pay several thousand dollars for a private attorney only to receive a prison sentence, especially the same prison sentence that he was being offered when he was represented by the Public Defender's Office.  Mr. Wright's testimony supports Mr. Thurston's testimony on this point. Second, the testimony of Mr. Thurston and Mr. Wright, as well as the record, reflects that Defendant and the victim had colluded to undermine the burglary charge prior to trial, at least until the victim wanted nothing more to do with him.  At trial, Mr. Thurston attempted to use the female victim's letter, voicemails, and prior welcome relationship with Defendant to impeach her at trial.  And, reviewing the record, it is clear that, as Mr. Thurston and Mr. Wright pointed out, the relationship between Defendant and the female victim was complex and dynamic.  As both sides noted at the hearing, this is likely why the jury acquitted Defendant on the tampering charge.  They did not believe that Defendant pressured the victim to write the letter, leave the voicemails, or send him the e-mails that were introduced into evidence at trial. Third, Mr. Thurston's defense strategy was not based solely on Defendant's personal property being in the victim's home.  It was based on the entire narrative coming from Defendant and the victim, and their family and friends, that the victim's home was "their home."  The fact that some of his personal property was in the home was only a part of the picture that he was painting at trial.  Finally, Defendant's testimony during the hearing was almost entirely incredible.  With the exception of his admission to receiving the victim's letter and passing it on to counsel (Rachel Morris), none of Defendant's statements regarding his involvement in the case correlate with what the record reflects.  It is undisputed that Defendant was communicating with the victim during

the pendency of the trial.  It is also undisputed that Defendant was providing his counsel with evidence (voicemails, the letter, e-mails, etc.) that benefited [sic] his defense to the burglary in a material way, which indicates his awareness of what the State needed to prove; and, what was needed to undermine that proof.  Defendant was not a passive participant in his case and his defense.  Defendant was actively communicating with the victim and formulating information that would show he did not commit a burglary.

10.    Based on the evidence presented at the evidentiary hearing and in the record, this Court finds that Mr Thurston did not misadvise Defendant regarding his defense at trial; and, Defendant did not make the decision to reject the plea offer and proceed to trial based on his counsel's advice.  Defendant proceeded to trial based on his belief that his relationship with the female victim could defeat the burglary charge. In addition, he did not want to accept a plea offer to a prison sentence. For these reasons, Defendant fails to show either error by counsel or prejudice.  Accordingly, the claim raised is without merit.

(Ex. O at 61–66).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. T).

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review."  Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); see also Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the

record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")).  Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."  Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843,74 L. Ed. 2d 646 (1983); *see also* Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing.").  Questions of the credibility and demeanor of a witness are questions of fact.  *See* Consalvo, *supra* (citing Freund v. Butterworth, 165 F.3d 839, 862 (11th Cir. 1999) (en banc)).  The AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e).

The transcript of the post-conviction evidentiary hearing and the documents submitted as exhibits at that hearing are part of the state court record.  Lerone Thurston testified that he had been practicing law since 1995 (Ex. P at 215).  He testified that he represented Petitioner in the criminal case from May 19, 2011 through

the end of Petitioner's trial in October of 2011 (*id.* at 215–16).  Attorney Thurston

testified that he received discovery from the State in Petitioner's case, but Petitioner

did not indicate that he wanted copies of any of the materials until after the trial (*id.*

at 217, 226).  Thurston testified that he and Petitioner discussed and agreed that they

would pursue a strategy of arguing to the jury that Petitioner was the victim in this

case, because he was shot by Anthony Green in Petitioner's own townhouse that he

shared with his girlfriend Leyna Bell (*id.* at 224–25).  Attorney Thurston testified that

he discussed with Petitioner that he would use letters written by Ms. Bell to impeach

her testimony at trial (*id.* at 224–25).

Attorney Thurston testified that he filed a pre-trial motion to dismiss the

charges based upon Petitioner's version of the events on the night of the crimes, but

he acknowledged that in hindsight, the motion was not "well-filed," because there

were many factual issues that required a jury determination (Ex. P at 237–38).

Thurston testified that he discussed the motion to dismiss with Petitioner prior to

filing it (*id.* at 218).

Attorney Thurston testified that he met with Petitioner approximately five times

during his 5-month representation, which occurred at Thurston's office and at

Petitioner's home (Ex. P at 218).  Thurston testified that he and Petitioner discussed

the State's 66-month plea offer twice, once at Petitioner's home and again in the

courthouse (*id.* at 219–20).  When questioned regarding the advice he gave Petitioner

regarding the plea offer, Attorney Thurston testified as follows:

> Q.    Now, Mr. Anderson states that you had indicated to him
> during your discussions regarding his case that you told him that he had
> a good chance of not being convicted of the burglary charge and that
> he—that you believed that he might not—he would probably not be
> convicted if he were to go to trial; do you recall that sir?

> A.    I told Mr. Anderson my theory of the defense, that if he
> lived in the property with the young lady, if they had an ongoing
> relationship, if he had access to her apartment whenever he wanted, I
> didn't think he could get convicted of burglary, but that's on that set of
> facts and I'm not in a position to swear for a jury or swear for what the
> Court would do.  So I mean I would have laid out his case to him the
> way I saw it, but I would not have personally guaranteed that he was
> going to be acquitted on those charges.

> Q.    Now was that conversation—did that conversation take
> place on more than one occasion?

> A.    Twice that I can remember.

> Q.    And you specifically told him that there was no guarantee?

> A.    Yes.

> Q.    When you were discussing with him the issue of going to
> trial versus taking the plea negotiation, did Mr. Anderson tell you
> express any concerns about why he did not want to take a plea
> negotiation in this case?

     A.     Yes, ma'am.  He said he had a case in the past with serious charges that they paid the attorney a lot of money, that at the end of the day the attorney didn't prosecute the case zealously, didn't take the case to trial, and that he ended up taking a plea and getting a significant sentence, and he did not want to do that again.  I said that's fine and I said, Well, I mean the scoresheet is the scoresheet, the judge could give you above the scoresheet, are you willing to, you know, take the risk that you're going to get a little bit more than the scoresheet, you know, and he said he would take the risk.  And that was the conversation that I had with him at his house.

     And then the second conversation at the courthouse, it was, I guess, a similar conversation.  I mean you've got a plea in hand and we don't know what the judge is going to do.  You know, do you—we could either—you know, he could—you could take the plea and know what you have or we could go to trial and run the risk of an enhanced sentence.  So that's what happened.

(Ex. P at 220–21).

Attorney Thurston testified that during a trial status conference on September 28, 2011, which Petitioner attended, the prosecutor re-conveyed the State's 66-month plea offer in open court, and the maximum sentence that Petitioner faced on the charges (Ex. P at 222).  Attorney Thurston testified that during that proceeding, as well as prior to jury selection on October 3, 2011, the trial judge conducted a colloquy with Petitioner as to whether he understood the State's plea offer and wished to accept or reject it, and Petitioner responded that he wished to proceed to trial (*id.* at 222–23, 226).  Thurston testified that following such colloquys, he discussed "best-case

scenario/worst-case scenarios" of going to trial with Petitioner (*id.* at 223). Thurston

testified that he "was . . . not overconfident in the facts that we had to work with," but

was committed to proceeding as zealously as possible on Petitioner's behalf to "do

whatever I could to exonerate him . . . ." (*id.* at 224). Specifically with regard to the

jury selection proceedings on October 3, 2011, Attorney Thurston testified that the

prosecutor announced the plea offer and the maximum sentence that Petitioner faced,

and the court permitted a break in the proceedings to provide Thurston and Petitioner

an opportunity to discuss the plea offer (*id.* at 226). Thurston testified that he went

into a break room with Petitioner and his parents, and they discussed Petitioner's

options (*id.*). Thurston testified that he advised Petitioner to strongly consider taking

the plea to minimize his sentence exposure (*id.* at 227). Attorney Thurston testified

that Petitioner "prayed on it," and decided "to just fight" (*id.* at 226–27).

Petitioner's post-conviction counsel cross-examined Attorney Thurston

regarding his understanding of the evidence and the theory of defense:

> A.    Mr. Anderson had an ongoing relationship with Ms. Bell
> and it was not —I mean years. There was talk about pregnancies. They
> had an ongoing relationship. It was my understanding that he was—had
> free access to her apartment, that he kept things there, that he could come
> and go as he pleased. One of the other girls in the—one of the other
> ladies in the case, you know, described Ms. Bell's apartment as his
> apartment and that Ms. Bell was wrong for having Mr. Green in Mr.
> Anderson's house. That's the way it was conveyed to me.

Q.    So your defense theory, if I can just sum it up, was essentially that because he had belongings—

A.    No, sir. That he—you can't burglarize your own house, that was it.

Q.    That was your theory of defense?

A.    That was it, sir.

Q.    And you—your theory was that it was his residence based on what?

A.    The testimony of Mr. Anderson and prior testimony of Ms. Bell and what I was told by Ms. Bell's friend who was at the residence. So his name was not on the lease, no, sir, but this was the living arrangement that I was told existed and I believed him.

Q.    Was there any physical evidence that you believed demonstrated that it was his residence?

A.    Apart from him keeping property in the house, no.

Q.    So you believed that property being kept in that residence demonstrated it was his residence?

A.    No, sir. No, sir. That—no, sir. No, no. Maybe that's how it came across at trial, maybe I didn't do a good job putting on the case, but that was not my theory.
. . . .
My theory was that he actually had legal access to the property.

Q.    So what significance was the property in the residence then?

A.    Suggestive of the fact that he, you know, would come and go from the place, . . . .

Q.   So you did believe that the belongings being there was indicative of the fact that it was his residence?

A.     Suggestive, that's correct.  Evidence supporting his—

Q.     Which, in turn—

A.     Yes, sir.

Q.     —demonstrated that he could not have committed a burglary because it was his residence; correct?

A.     I don't mean to parse words with you, sir, but if you're asking me if my idea was because he had a T.V. in the lady's bedroom he could not commit a burglary, that was not my idea.  It was my idea that was his girlfriend, he had a key, he could come over whenever he wanted, and no other men are supposed to be in the house, then that was my understanding.   That was my understanding of their living arrangement and I wasn't going to judge it.  I was just going to take it at face value and present it to the jury.

Q.     Prior to trial did you advise Mr. Anderson that the fact that he did have belongings in the residence tended to demonstrate that he was at least part owner or had a right to the residence, I guess I should say?

A.     Yes, sir.  I told him—

Q.     You do—you admit to telling him that?

A.     Absolutely, that helped our case.

(Ex. P at 234–37).  Attorney Thurston characterized the defense as "viable" (*id.* at

238–39).  He testified that he advised Petitioner that he believed that they had "a

chance" of winning at trial (*id.* at 239). However, he reiterated that he advised Petitioner to accept the State's 66-month plea offer (*id.* at 239–40).

Petitioner has not shown by clear and convincing evidence that the state court's factual findings, including its credibility determinations, are unreasonable in light of the evidence presented to the state court. Therefore, this court, on federal habeas, accepts as true the state court's factual findings, including its determination that Attorney Thurston's testimony was credible, and that Petitioner's testimony was incredible (except with regard to Petitioner's "corrected" testimony that he had provided Attorney Thurston with the "recantation letter" written by Leyna Bell (*see* Ex. P at 208–11, 243–45)). Based upon Attorney Thurston's testimony, the state court reasonably concluded that Petitioner failed to demonstrate that Attorney Thurston's representation was deficient with respect to the plea negotiations. Therefore, Petitioner is not entitled to federal habeas relief on Ground Three.

IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>9</u><sup>th</sup> day of January 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**